UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

AMERICAN DEVELOPMENT                    :
GROUP, LLC,                             :
                                        :
                    Plaintiff,          :
                                        :
        -against-                       :
                                        :
ISLAND ROBOTS OF FLORIDA                :
and TERI LOUISE CAPO,                   :
                                        :
                    Defendants.         :
                                        :

-------------------------------------------------------------- X

**REPORT AND
RECOMMENDATION**

17-CV-3223 (NGG) (PK)

**Peggy Kuo, United States Magistrate Judge:**

Plaintiff American Development Group, LLC ("Plaintiff") brought this diversity action

against Island Robots of Florida and Teri Louise Capo (collectively, "Defendants"), alleging various

causes of action arising from a contract between the parties, in which Defendants were to provide

Plaintiff with a robotic "Parking Garage Attendant" that Plaintiff could use to market itself at a

grand opening of one of its parking garages.[1] (Second Amended Complaint ("SAC"), Dkt. 39.)

Before the Court on referral from the Honorable Nicholas G. Garaufis is Plaintiff's Motion

for Default Judgment against Defendants ("Motion") (Dkt. 57.) For the reasons stated herein, the

undersigned respectfully recommends that the Motion be granted in part and damages awarded as

detailed below.

---

[1] Plaintiff initially brought nine causes of action. (Dkt. 39.) In its supplemental briefing following
the Court's Hearing and Inquest, Plaintiff withdrew five claims, without prejudice. (Dkt. 66, at pp.
2-3.) Accordingly, only four claims remain and are the subject of the Motion: Count Three (Fraud),
Count Four (Breach of Contract), Count Eight (Violations of the Uniform Commercial Code), and
Count Nine (Violations of New York's False Advertising Law).

## FACTUAL BACKGROUND

The following facts, taken from the SAC, are accepted as true for the purposes of the Motion. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). Additional facts are based on Plaintiff's supplemental submissions, as indicated. *Cont'l Ins. Co. v. Huff Enterprises Inc.*, No. 07-CV-3821 (NGG), 2009 WL 3756630, at *4 (E.D.N.Y. Nov. 6, 2009).

Plaintiff is a limited liability company in the business of operating and purchasing, developing, selling, and managing real property, including parking garages, in the tri-state area. (SAC, ¶¶ 8-9, 19; Affidavit of Perry Finkelman ("Finkelman Aff."), ¶¶ 3-4, Dkt. 65-3.) Plaintiff acts as an agent for various limited liability companies formed for the purpose of operating and managing individual properties, including WOC Schermerhorn Garage Company LLC ("WOC.") (Finkelman Aff., ¶¶ 4-5.) Plaintiff formed WOC to operate a parking garage (the "Garage") located at 189 Schermerhorn Street in Brooklyn, New York. (*Id.*, ¶ 6, Pl. Supp. Mem. at p. 4, Dkt. 65.)

In anticipation of the opening of the Garage on August 1, 2016, Plaintiff planned a "Grand Opening" event that would showcase the Garage to new customers and potential investors. (SAC, ¶¶ 2-3; Affirmation of Anna A. Higgins ("Higgins Aff."), ¶ 11, Dkt. 57.) Through internet searches, Plaintiff learned that Defendants were in the business of manufacturing and developing automated robots and could modify a custom-made robot to be used to greet guests for marketing the Garage at the Grand Opening. (SAC, ¶¶ 2-3, 20-21, 24, 58; Higgins Aff., ¶¶ 9, 11.)

On April 13, 2016, Defendant Teri Louise Capo, the owner of Defendant Island Robots of Florida, along with her colleague Russ Martin, sent Plaintiff an email attaching a press release from Island Robots of Florida's website, along with a product information sheet on their robot, the "FoneBot." (SAC, ¶ 24; Pl. Supp. Mem., Ex. 9, Dkt. 65-4.) The email from Capo and Martin states:

> We have had an overwhelming response to our new "FoneBot." This is an exciting way to "Brand" your product etc. Please see the attached PDF and should you have any questions, please feel free to call or email with any questions. Check out our Website and FaceBook links below!

(Pl. Supp. Mem., Ex. 9.)

The press release attached to the email is dated February 23, 2016 and describes the "FoneBot" as a "5 foot 8 inch walking talking smart phone," and a "strolling billboard" that is "fully mobile, interactive" that can be programmed with "custom app panels" and "video presentations." (*Id.*) The press release touts Martin as "a popular robot designer with over 30 years experience in robotics, animatronics and automation." It also claims that Martin has "a lengthy resume of prestigious clients such as Disney World, Sea World, NASA, Ripleys, Universal Studios, Westinghouse and many others." The materials also describe Defendants' robots as "fully mobile with our proprietary control system/voice effects that allows for spontaneous interaction with curious onlookers!" (*Id.*)

The materials describe the FoneBot in detail, explaining that it is "fully mobile (he can go anywhere a wheelchair can), and he can spin his head 360 degrees to see where he's been!" (*Id.*) It is also "very sturdy and can serve drinks, snacks or pass out promotional materials;" it can also shake hands with people. The FoneBot is described as having "app panels" that can be "fitted with any logos, promotional materials, or even video." The materials list "Features" and "Options" that customers can choose for the FoneBot. The FoneBot's "Features" include: "fully mobile with moving head and arms," "on-board video monitor and color camera," "vibrator function for laughs," "on-board battery charger," "cup controller/mic for covert operation," "replaceable 'app' panels for promotions," and "adjustable digital voice effects." "Options" for the FoneBot include: "multiple video panels and media player," "autonomous mode," "on-board wifi for observer interaction," "high power audio system," "back lighting for 'app' panels," "custom color schemes/graphics," and "video XMTR to on-site monitors." (*Id.*)

After receiving the materials from Defendants, Perry Finkelman, Plaintiff's CEO, directed Robert Shelly, Plaintiff's Vice President of Field Operations, to speak to Defendants further about

their products.  (*Id.*)  Finkelman wrote to Shelly, "This is the company I want to have you talk to.  I spoke with them.  I need to have a bit of interactive, such as hello, please drive in or have a nice day."  (*Id.*)

Consequently, between June 13, 2016 and July 25, 2016, the parties telephoned and exchanged emails concerning Defendants' capabilities and Plaintiff's intended purpose for the robot.  (SAC, ¶¶ 23-24, 59; Pl. Supp. Mem., Ex. 7, Dkt. 65-2.)  Specifically, Plaintiff spoke with Martin, who claimed to be an "'owner' of Island Robots of Florida and the "'inventor'" of the robots.  (*Id.*, ¶ 24.)  Martin represented that he could retrofit an existing FoneBot into a robotic parking garage attendant (the "Robot.")  (*Id.*; Contract, p. 1, Dkt. 12-1.)  Martin assured Plaintiff that the Robot would provide entertainment and information to guests at the Garage's Grand Opening event and would be "'fully functional upon delivery and would not require any special setup.'"  (SAC, ¶ 24.)  Defendants also represented that the Robot would be sent "'turn-key ready'" and would "'power up out of the box.'"  (*Id.*, ¶ 3.)  Martin also represented that he would be able to assist Plaintiff via telephone or the internet after it received the Robot and that a "'user friendly manual'" would be delivered with the Robot.  (SAC, ¶ 30; Pl. Supp. Mem., Ex. 7.)

On July 25, 2016, Plaintiff executed the contract sent by Defendants (the "Contract"), with the "Subject" listed as "Robot Parking Garage Attendant."  (Contract, Dkt. 12-1.)  The Contract contained "Proposed Modifications" of the existing FoneBot, "Proposed Operation" of the Robot, "Specifications," "Terms and Delivery," warranty provisions, drawings of the Robot, and a provision concerning "Additional Work."  (SAC, ¶ 29; Contract; Finkelman Aff., ¶ 8.)

The "Proposed Modifications" represented that the Robot "is currently configured for remote operation for interacting with observers" and will be "modified for autonomous operation," will have a video media player installed that can be updated "easily" by Plaintiff "by simply inserting the removable media in the robot," will have a voice recorder installed to allow the Robot to convey

4

audio information, and will contain a "laser proximity sensor" that will trigger "preprogrammed routines as an observer approaches the [R]obot." (SAC, ¶ 27; Contract, p. 1.) The Robot will also "be programmed with random eye and arm movements (triggered by proximity sensor), with sound effects capabilities." (Contract, p. 1.)

The "Proposed Operation" of the Robot provided for an "autonomous mode," in which the Robot was stationary and could "entertain and provide customer information," and a "mobile mode," which would allow the Robot to "drive about, mingle with observers and interact verbally." The Robot will also have an "on-board digital audio effects processor that is user adjustable to make any type of voice from various operators." (*Id.*, p. 2.)

Under "Terms and Delivery," the total cost for the option with a larger monitor screen and overall height, was stated to be $8,500, not including shipping. Defendants required a 50% deposit to "initiate construction" of the Robot, and the remaining 50% prior to shipping. Defendants promised that the total time from receipt of the deposit to shipping would be five days. "A reusable crate IS included in the above price." (*Id.*)

The Contract provided for a limited one-year warranty "covering defects in materials and workmanship." (*Id.*, pp. 2, 8.) A section entitled "Warranty" on page 2 of the Contract states this limited warranty, and a lengthy full-page warranty on the last page, entitled, "Island Robots of Florida Limited One-Year Warranty," sets out more details on the scope of the warranty and how to obtain warranty service. (*Id.*) The lengthy warranty contains various limitations and exclusions written in all capital letters, including the fact that information and illustrations provided in the Contract "DO NOT EXPRESS OR IMPLY A WARRANTY THAT THE ROBOT IS MERCHANTABLE OR FIT FOR A PARTICULAR PURPOSE, OR THAT THE ROBOT WILL NECESSARILY CONFORM TO THE ILLUSTRATIONS OR DESCRIPTIONS PROVIDED." The warranty also excludes "INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL

5

DAMAGES." (*Id.*, p. 8.)  In order to obtain warranty service, the purchaser would first need to contact Island Robots of Florida, and then ship the robot back to Defendants in the same reusable crate in which it was shipped, or a similar crate.  Defendants would repair the robot without charge for labor costs or parts, or replace it with a similar product.  The purchaser would be responsible for the cost of shipping the repaired robot back to itself.  (*Id.*)

The Contract's "Additional Work" provision contains the following representations: "No installation is necessary as operation is straightforward and the robot is ready to run out of the crate. . . [t]he robot shall be delivered fully programmed and ready to secure in place and power up." (*Id.*, p. 3.)  This section provides for on-site assistance if required by the customer, at a rate of $1,200 for the first day, and $800 per day thereafter, for a maximum of four days.  The purchaser would also be required to pay for airfare, ground transportation, and adequate lodging (to be pre-approved by Defendants) for two adults.  (*Id.*)

On July 25, 2016, after executing the Contract, Plaintiff sent Defendants a wire transfer for $4,250, half of the Contract price.  (Inquest, Ex. 2, Dkt. 64-1; Pl. Supp. Mem., Ex. 10, Dkt. 65-5.) Pursuant to the Contract's terms, the remaining $4,250 was sent via wire transfer to Defendants on July 29, 2016.  (Inquest, Ex. 2.)  After spending $1,750 on shipping costs, Plaintiff received the Robot on July 31, 2016.  (SAC, ¶ 34; Inquest, Ex. 3, Dkt. 64-2.)  The Robot was delivered "lying on its back, without any special device(s) securing it in place," with no protective packaging and not in a reusable crate as provided for in the Contract.  (SAC, ¶ 36.)  The Robot also did not include a user manual, as promised.  (*Id.*, ¶ 37.)  The Robot failed to "'power up'" when Plaintiff received it, and in fact, Plaintiff could never turn it on or get it to work.  (*Id.*, ¶¶ 38, 39.)  Plaintiff immediately called Defendants to complain, but Defendants failed to respond that day.  (*Id.*, ¶ 40.)  The next morning, August 1, 2016, Plaintiff called Defendants again, and received a response around 5:30 p.m., when Defendants emailed to state that they forgot to include the instruction manual, but told Plaintiff that

they "'could and would, resolve any technical issues remotely.'"  (*Id.*, ¶ 42.)  Despite numerous

representations by Defendants between August 1 and 15, 2016 that they would provide technical

assistance to ensure that the Robot would "'power up,'" no technical assistance was ever provided.

(*Id.*, ¶ 43.)  Defendants thereafter told Plaintiff that the problems with the Robot were specific, such

that "'special'" support was needed to fix them, which required Plaintiff to provide $2,000 in travel

expenses to Defendants so that Martin could fly from Florida to fix the Robot in person.  (*Id.*, ¶ 44.)

On August 15, 2016, Defendants said they would agree to repair the Robot only if Plaintiff

"'promised in writing'" not to file a lawsuit against them.  (*Id.*, ¶ 45.)  Plaintiff then demanded a full

refund of the Robot price and the shipping charges it incurred.  (*Id.*, ¶ 46; Finkelman Aff., ¶ 9.)

Defendants ignored Plaintiff's demand for a refund and stopped returning Plaintiff's calls and

emails.  (SAC, ¶ 47; Finkelman Aff., ¶ 9.)  Defendants also failed to respond to a demand letter sent

by Plaintiff's attorneys.  (SAC, ¶ 48.)  Plaintiff was unable to use the non-functioning Robot during

the Grand Opening event at the Garage, or ever, and has been forced to pay for its storage ever

since.  (SAC, ¶¶ 6, 50, 51.)

## PROCEDURAL BACKGROUND

Plaintiff first filed the action on May 22, 2017 in the Southern District of New York.  (Dkt.

2.)  Thereafter, the case was transferred to this Court, and Plaintiff ultimately filed the SAC on June

11, 2018 (Dkt. 39.)  Defendant Island Robots of Florida was served through the Florida Department

of State Division of Corporations on November 29, 2018, and through personal service on

Defendant Teri Louise Capo.  (Higgins Aff., Exs. K-L, Dkts. 57-12, 57-13.)  Capo was served by

personal service on January 4, 2019.  (*Id.*, Ex. L.)  Although Capo appeared *pro se* and filed an

"Answer, and Motion to Dismiss" to the first complaint on July 27, 2017 (Dkt. 20), neither

defendant responded to the SAC.  After Plaintiff filed the proper affidavits of service (Dkts. 49, 52),

Plaintiff requested and the Clerk of the Court entered a default as to Island Robots of Florida on December 21, 2018 and Teri Louise Capo on February 13, 2019. (Dkts. 51, 56.)

Plaintiff filed the Motion on February 22, 2019, requesting default judgment as to all of its claims and seeking damages, costs, and attorneys' fees. (Dkt. 57.)

The undersigned held a Hearing and Inquest on the Motion on August 14, 2019, at which Plaintiff's Vice President of Operations Robert Shelly answered questions under oath, and Plaintiff submitted exhibits in support of the Motion. (*See* Minute Entry dated August 14, 2019.)

## DISCUSSION

### I.    Standard for Default Judgment

In order to grant a default judgment, a court must first ensure that Plaintiff took all the required procedural steps in moving for default judgment, including providing proper notice to Defendants of the Motion. Local Civ. R. 55.2(c). Although a "default judgment is ordinarily justified where a defendant fails to respond to the complaint," a court must nevertheless determine whether the allegations establish liability as a matter of law. *SEC v. Anticevic*, No. 05-CV-6991 (KMW), 2009 WL 4250508, at \*2 (S.D.N.Y. Nov. 30, 2009); *see also Finkel*, 577 F.3d at 84. Even after the entry of default, "it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Trs. of the Plumbers Local Union No. 1 Welfare Fund. v. Philip Gen. Constr.*, No. 05-CV-1665 (NG) (RML), 2007 WL 3124612, at \*3 (E.D.N.Y. Oct. 23, 2007) (quoting *In re Wildfire Ctr., Inc.*, 102 B.R. 321, 325 (E.D.N.Y 1989)). In determining liability, a court accepts as true the well-pleaded allegations of a complaint, drawing all reasonable inferences in favor of Plaintiff. *See Finkel*, 577 F.3d at 84; *see also Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).

## II.    Jurisdiction

### A.    *Subject Matter Jurisdiction*

This Court has jurisdiction over this action pursuant to the federal diversity statute, 28 U.S.C. § 1332, because there is diversity of citizenship and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(1). "Unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify a dismissal." *PLS Fin. Servs., Inc. v. Soliman*, No. 19-CV-1443 (JGK), 2019 WL 2420044, at * 1 (S.D.N.Y. June 10, 2019) (quoting *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.3d 82, 87 (2d Cir. 1991)). Claims for attorneys' fees may be included in determining the jurisdictional amount if they are recoverable pursuant to a statute or contract. *See, e.g., Sheldon v. Khanal*, No. 08-CV-3676 (KAM) (LB), 2011 WL 3876970, at *7 (E.D.N.Y. Aug. 31, 2011) (citing *Givens v. W.T. Grant Co.*, 457 F.2d 612, 614 (2d Cir. 1972)).

Here, although the Contract amount is for less than $75,000, Plaintiff alleges violations of New York's false advertising law, General Business Law Section 350, which provides for an award of attorneys' fees, that could reasonably exceed $75,000. (SAC, ¶ 115-121.) *See* N.Y. Gen. Bus. Law § 350 (McKinney, 2019). The undersigned finds that Plaintiff pled in good faith that the amount in controversy exceeds $75,000, and there is not a legal certainty that the claim is for less than $75,000. (SAC, ¶ 17.)

Plaintiff also established diversity of the parties. Plaintiff is a limited liability company with a principal place of business in New York, the sole member of which is Perry Finkelman, who is domiciled in New York. (SAC, ¶¶ 8, 9; Minute Entry dated May 9, 2018.) Defendant Capo is a citizen of the State of Florida. (SAC, ¶¶ 13-16.) Defendant Island Robots of Florida is a "fictitious name" filed in Florida that was registered to Capo from February 3, 2016 until February 28, 2017, when it was canceled and registered to Russ O. Martin. (SAC, ¶¶ 10-11; Dkt. 65-1.) Capo, as the

owner of the entity at the time of the Contract, is the real party in interest. (Dkt. 65-1.)  *See*

*Maldonado v. Alta Healthcare Grp., Inc.*, 17 F. Supp. 3d 1181, 1189 (M.D. Fla. 2014) ("In Florida, a

'fictitious name' has no independent legal existence, and can only be sued through its owner.").  A

Florida address is listed for Capo in the Fictitious Name Detail filed with the Florida Division of

Corporations, indicating that Capo (and, by extension, Island Robots of Florida) is a Florida citizen.

Accordingly, diversity of citizenship is met.

### B.  Personal Jurisdiction and Service

"[A] court may not properly enter a default judgment until it has jurisdiction over the person

of the party against whom the judgment is sought, which also means that he must have been

effectively served with process."  *Lopez v. Yossi's Heimishe Bakery Inc.*, No. 13-CV-5050 (FB) (CLP),

2015 WL 1469619, at *4 (E.D.N.Y. Mar. 30, 2015).  An individual may be served according to state

law where service is made.  Fed. R. Civ. P. 4(e)(1).  Likewise, a corporation may be served in the

same manner for serving an individual as prescribed by Federal Rule of Civil Procedure 4(e)(1) or by

delivering a copy of the Summons and Complaint to an officer appointed by law to receive such

service.  Fed. R. Civ. P. 4(h)(1).

Since Defendants are citizens of Florida, Florida law governs service.  Florida Statute Section

48.031 governs service in Florida.  Fla. Stat. § 48.031 (2019).  Under Florida law, individuals may be

served by delivering a copy of the summons and complaint to the person named, or to the

individual's usual place of abode with any person residing therein who is over the age of 15 and

informing that person of the contents.  *See id.*  "A defendant's refusal to open the door does not

invalidate plaintiff's service.  Personal service need not be face to face or hand to hand."  *Microsoft

Corp. v. Silver Eagle Computers, Inc.*, No. 6:06-cv-1405-Orl-19JGG, 2006 WL 3391229, at *2 (M.D. Fla.

Nov. 22, 2006) (internal quotations omitted).

Plaintiff provided an affidavit from the investigator and process server who served Capo with the Summons and Complaint on January 4, 2019. (Affidavits of Sally Susino and Deitra Brock, Dkt. 57-13.) An initial database search led the investigators to 19614 Sabal Street, Orlando, Florida, but when the investigators attempted to serve Capo there, they were told by the current resident that Capo does not live there. (*Id.*, ¶ 7.) In September 2018, the investigators also attempted to serve Capo at 20541 Quinlan Street, Orlando, Florida, an address that Capo used when she sent letters to the Court in October 2017. (*Id.*, ¶¶ 9-11; Dkts. 28, 29.) The investigators were told by the purported owner that he had evicted Capo six months before, although the local post office indicated that Capo was still receiving mail there. (Dkt. 57-13, ¶ 11.)

In November 2018, an updated database search listed Capo's address as 3300 Magnolia Way, Punta Gorda, Florida, and service was attempted on Capo there on November 16, 2018. (*Id.*, ¶ 13.) The server was told by the owner of the property, who identified himself as "Russ Martin," that Capo did not reside there. (*Id.*) However, the Punta Gorda Post Office confirmed on December 18, 2018 that Capo was receiving mail at that address, and there was no change of address on file. (*Id.*, ¶ 14.) On January 4, 2019, the process server returned to the property at 3300 Magnolia Way, and met a male resident at the door, who stated that Capo was not there and did not reside at that address. (*Id.*, ¶ 15.) Although the door was not fully open, the process server recognized the male's likeness as that of the person who previously identified himself as "Russ Martin." (*Id.*, Aff. of Sally Susino.) The male refused to accept service of the papers, and the process server placed them on the ground in front of the door and advised him of that fact. (*Id.*) The process server noticed that a vehicle with the license plate number Y49RNK was parked in the driveway at the time she effectuated service. (*Id.*, ¶ 15.) A search of the Florida State Department of Vehicles on January 4, 2019 revealed that the vehicle was registered in Capo's name at 3300 Magnolia Way, Punta Gorda, Florida. (*Id.*, ¶ 16.)

The undersigned finds that Capo was effectively served, despite her efforts to evade service. The Summons and Complaint were served on an adult male at her residence, whom the process server recognized as "Russ Martin," an individual who is over the age of 15. Capo's address was confirmed through motor vehicle records and the Punta Gorda Post Office. Capo's vehicle was observed outside the residence on the date of service. The process server informed Martin of the contents of the documents, and Martin himself acknowledged receipt of the Summons and Complaint at 3300 Magnolia Way, Punta Gorda, Florida.[2] (Dkt. 53.) Accordingly, Capo was properly served. Because Island Robots of Florida is a fictitious entity that was registered to Capo, it was also effectively served through service of Capo.[3] *See, e.g., Ferrara Candy Co. v. Exhale Vapor LLC,* Case No. 2:17-cv-512-FtM-38MRM, 2018 WL 6261503, at *2 (M.D. Fla. Jan. 3, 2018).

### III. Procedural Compliance

Plaintiff filed the following documents in support of the Motion: Notice of Motion (Dkt. 57); Memoranda of Law in Support of Plaintiff's Motion for Default Judgment (Dkts. 57-1, 65); declarations in support (Dkts. 57, 65-3); the Clerk's Certificates of Default (Dkts. 57-14, 57-15); the SAC (Dkt. 57-2); a proposed order (Dkt. 59-1); proof of service of the SAC (Dkts. 57-12, 57-13); and proof of mailing of the Motion to the defaulting parties (Dkt. 58.) These documents are in compliance with Local Civil Rules 7.1 and 55.2.

---

[2] Although Russ Martin is not named as a party, he has sent correspondence to the Court, expressing confusion as to why he is receiving documents related to this case. (*See, e.g.,* Dkts. 37, 46, 53, 63.)

[3] Plaintiff also sent a copy of the Summons and Complaint addressed to Island Robots of Florida to the Florida State Division of Corporations on November 29, 2018, but because Island Robots of Florida does not appear to be a corporation, this does not have legal effect on that entity. (Dkt. 57-12.)

IV.    **Liability**

A. *Choice of Law*

"Federal courts exercising diversity jurisdiction apply the choice-of-law rules of the forum state . . . to decide which state's substantive law governs." *Ferracane v. United States*, No. 02-CV-1037 (SLT), 2007 WL 316570, at *3 (E.D.N.Y. Jan. 30, 2007) (quoting *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000)). "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 301 (2d Cir. 2000). In the context of default judgment actions, Plaintiff's reliance on New York law is sufficient for the Court to apply New York law. *See, e.g., Potamkin New York, LP v. Gem Auto Brokers Inc.*, No. 11-CV-6515 (JGK) (GWG), 2012 WL 1898896, at *2 n.2 (S.D.N.Y. May 1, 2012), *R&R adopted*, 2012 WL 1870949 (S.D.N.Y. May 23, 2012).

Plaintiff relied on New York law in the Motion, and Defendants have not appeared in this action. The undersigned finds that New York has the most significant interest in this action because it is the state in which Plaintiff is domiciled and where Plaintiff alleges it was injured. Accordingly, it is appropriate to apply New York law in this case.

B. *Breach of Contract*

Count Four of the SAC alleges breach of contract. (SAC, ¶¶ 88-92.) To support a claim of breach of contract under New York law, there must be an agreement, adequate performance by Plaintiff, breach by Defendant, and damages. *See, e.g., Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Failure to perform constitutes a breach of contract. *See NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1020 (2d Cir. 2014); RESTATEMENT (SECOND) OF CONTRACTS § 235(b) (1981).

The SAC establishes that an enforceable contract was formed between the parties on July 25, 2016. (SAC., ¶ 89; Contract, p. 3.) Plaintiff alleges that it performed all of its obligations under the

contract.  (SAC, ¶ 90.)  Pursuant to the terms of the Contract, requiring a "50% deposit to initiate construction," Plaintiff submitted proof of payment of a wire transfer in the amount of $4,250 to Defendants on July 25, 2019.  (Contract, p. 2; Dkt. 64-1.)  The second wire transfer of $4,250 was sent to Defendants on July 29, 2016.  (*Id.*)

Plaintiff has adequately alleged Defendants' breach by the failure of the Robot to function as promised upon delivery, or ever, as specified in the Contract section entitled "Proposed Modifications."  (SAC, ¶¶ 4, 6, 35-39, 91; Contract, pp. 1-2.)  In addition, Defendants refused to honor the warranty provision of the Contract, which was invoked almost immediately.  (SAC, ¶ 91; Contract, p. 2; Finkelman Aff., ¶ 9.)  Plaintiff has adequately alleged that it suffered damage through its purchase of a non-functioning Robot as a result of Defendants' breach.  (SAC, ¶ 92; Dkts. 64-1; 64-2.)

Accepting Plaintiff's allegations as true, the undersigned finds that Plaintiff has adequately established a claim for breach of contract.

### C. Fraud

Count Three of the SAC pleads a fraud claim.  (SAC, ¶¶ 74-87.)  Under New York law, a cause of action for fraud requires the following five elements: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (citations omitted); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976 (2009).  Pursuant to Federal Rule of Civil Procedure 9(b), fraud must be pled with particularity and the SAC must specify the fraudulent statements made, by whom, when and where they were made, and why they are fraudulent.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  While the requisite "malice, intent, [or] knowledge" may be pled generally, Plaintiff must allege facts demonstrating "strong circumstantial evidence" of Defendants' conscious

14

misbehavior or recklessness, or show that Defendants had a motive and opportunity to commit fraud. *Id.* While "general allegations that a defendant entered into a contract with the intent not to perform" are insufficient to state a fraud claim, a misrepresentation of a material fact that is collateral to the contract and serves as an inducement to enter into the contract is sufficient, and is not duplicative of a parallel contract claim. *Introna v. Huntington Learning Centers, Inc.*, 911 N.Y.S.2d 442, 445 (2d Dep't 2010); *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

In addition, a fraud claim is not duplicative of a breach of contract claim where Plaintiff seeks damages that are not recoverable in contract claims. *Id.; see also Selinger Enterprises, Inc. v. Cassuto*, 860 N.Y.S.2d 533, 536 (2d Dep't 2008). Misrepresentations included in brochures or other materials not in the contract itself may also constitute material misrepresentations forming the basis of the fraud claim. *Introna*, 911 N.Y.S. 2d at 445. Reliance is reasonable where factual representations are solely within Defendants' knowledge, or Plaintiff is unable to assess, through exercising ordinary intelligence, the truth or quality of the factual representations. *See ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921, 922–23 (2015).

Plaintiff has sufficiently alleged with the requisite particularity Defendants' misrepresentation of a material fact and strong circumstantial evidence of Defendants' knowledge of the falsity of their representations. Plaintiff exchanged several emails with Capo and Martin before entering into the Contract, as well as before the Robot was shipped, between June 13 and July 27, 2016. (SAC, ¶ 23.) Defendants claimed that the Robot would be sent "'turn-key ready,'" "'power up out of the box,'" be "'self-automated,'" and "'fully functional upon delivery and would not require any special setup.'" (SAC, ¶¶ 3, 24, 27, 28, 65, 77, 78.) Plaintiff alleged with the requisite particularity that these statements were false; the Robot did not function at all when it was received, and it has never functioned. (SAC, ¶¶ 4, 38, 39, 80-83.)

In addition, Plaintiff adequately alleged Defendants' intent to induce reliance on their misrepresentations, many of which were extraneous to the Contract. In April 2016, before they executed the Contract, Defendants sent at least one email and the parties spoke on the telephone regarding Defendants' capabilities. Capo and Martin stated, "We have had an overwhelming response to our new 'FoneBot.' This is an exciting way to 'Brand' your product etc. Please see attached PDF . . .please feel free to call or email with any questions. Check out our Website and FaceBook links below!" (Pl. Supp. Mem., Ex. 9, Dkt. 65-4.) The materials attached to Defendants' email contain statements such as, "This life size (5' 8") tall walking talking billboard is a real crowd pleaser for young and old alike." (*Id.*) They claim the Robot is "fully mobile (he can go anywhere a wheelchair can), and he can spin his head 360 degrees to see where he's been!" and "[h]e is very sturdy and can serve drinks, snacks, or pass out promotional materials." (*Id.*) The "features" section of the materials indicate that the Robot will be "fully mobile with moving head and arms," have "on-board video monitor and color camera," "vibrator function for laughs," "on-board battery charger," "cup controller/mic for covert operation," "replaceable 'app' panels for promotions," and "adjustable digital voice effects." (*Id.*) As Plaintiff has alleged, these statements were false: the Robot would not turn on, let alone perform any of the myriad functions Defendants represented it would. These statements also induced Plaintiff to buy the Robot. After receiving Defendants' email attaching marketing materials regarding the Robot, Finkelman wrote to Shelly, "This is the company I want to have you talk to. I spoke with them. I need to have a bit of interactive, such as hello, please drive in or have a nice day." (*Id.*; *see also* SAC, ¶¶ 21-22, 25, 28.) The undersigned finds that Defendants' statements present strong circumstantial evidence of Defendants' "conscious misbehavior or recklessness" to the fact that the Robot could not perform the functions advertised in their promotional materials, yet they knew these materials would induce Plaintiff to purchase it. *Lerner*, 459 F.3d at 290.

16

Plaintiff has also alleged that its reliance on Defendants' representations was reasonable. (SAC, ¶¶ 25, 29, 64, 69, 82.)  Defendants operated a website and advertised on Facebook.  (Dkt. 65-4.)  Defendants marketed a sophisticated product – a "walking talking billboard" – and Plaintiff had no means to assess the veracity of the statements or examine the Robot in person before it was shipped to New York.

Finally, Plaintiff has adequately alleged that it suffered damages as a result of the cost of buying and shipping a defective product.  *See, e.g., Barrie House Coffee Co. v. Teampac, LLC*, No. 13-CV-8230 (VB)*,* 2016 WL 3645199, at *11 (S.D.N.Y. June 30, 2016).  Accepting all the allegations in the complaint as true, as the Court must on a motion for default judgment, the undersigned finds that Plaintiff has satisfied all of the elements of its fraud claim and established Defendants' liability.

### D.  Violations of the Uniform Commercial Code

Count Eight of the SAC alleges violations of the Uniform Commercial Code ("U.C.C."), codified in New York at N.Y. U.C.C. Law §§ 2-314 (Implied Warranty: Merchantability; Usage of Trade) and 2-315 (Implied Warranty: Fitness for Particular Purpose).  (SAC, ¶¶ 109-114.)  The U.C.C. applies where the contract is for the sale of goods, even where services such as instruction and supervision may be contemplated.  *See* N.Y. U.C.C. Law § 2-102 (McKinney, 2019) ("this Article applies to transactions in goods"); *KSW Mech. Servs. v. Johnson Controls, Inc.*, 992 F. Supp. 2d 135, 141 (E.D.N.Y. 2014).  Under Section 2-314, an implied warranty exists in all contracts that the goods are merchantable, so long as the seller is a merchant of the types of goods sold.  N.Y. U.C.C. Law § 2-314(1).  Goods are "merchantable" when they "pass without objection in the trade under the contract description," and "are fit for the ordinary purposes for which such goods are used."  *Id.* § 2-314(2)(a) and (c).  "The warranty of fitness for ordinary purposes is not a guarantee that the product will be perfectly safe or fulfill a buyer's every expectation," but "such a warranty provides for a minimal level of quality."  *Ferracane v. United States*, No. 02-CV-1037 (SLT), 2007 WL 316570, at

*8 (E.D.N.Y. Jan. 30, 2007) (internal quotations and citations omitted).  The focus is on the "expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 434 (2d Cir.), *certified question accepted,* 21 N.Y.3d 937, 990 N.E.2d 130 (2013), *and certified question answered*, 22 N.Y.3d 439, 5 N.E.3d 11 (2013) (quoting *Denny v. Ford Motor Co.*, 662 N.E.2d 730, 736 (1995)).

Section 2-315 provides for an implied warranty for the fitness of the goods for a particular purpose in cases where the seller knows of the purpose for which the goods are required at the time the contract is executed.  *See* N.Y. U.C.C. Law § 2-315.  To establish a claim pursuant to Section 2-315, the buyer must establish that it "was justifiably relying upon the seller's skill and judgment to select and furnish suitable goods, and that the buyer did in fact rely on that skill." *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 896 (E.D.N.Y. 2018), *adhered to on reconsideration*, No. 18-CV-0334 (SJF) (SIL), 2019 WL 1118052 (E.D.N.Y. Mar. 11, 2019).

Pursuant to Section 2-316, parties to a contract may exclude express or implied warranties, so long as the exclusions mention merchantability and are conspicuous.  *See* N.Y. U.C.C. Law § 2-316(2).  A buyer "cannot justifiably rely on a representation that is specifically disclaimed in an agreement." *Rensselaer Polytechnic Inst. v. Varian, Inc.*, 340 F. App'x 747, 750 (2d Cir. 2009) (internal quotations and citations omitted).  "The question of whether a particular disclaimer is conspicuous is a question of law to be determined by the Court." *Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 682 (E.D.N.Y. 2013).  A disclaimer is conspicuous if a reasonable person ought to have noticed, or if it is in "larger or other contrasting type or color." *Landis & Staefa (UK) Ltd. v. Flair Int'l Corp.*, 60 F. Supp. 2d 14, 22 (E.D.N.Y. 1999) (quoting U.C.C. § 1-201(2)).

The undersigned finds that although the U.C.C. applies here, the Contract disclaimed Plaintiff's ability to bring claims based on implied warranty or warranty of fitness for a particular purpose.  The last page of the Contract contains conspicuous language that excludes implied

18

warranties, stating that the product information and illustrations contained in the Contract "DO
NOT EXPRESS OR IMPLY A WARRANTY THAT THE ROBOT IS MERCHANTABLE, OR
FIT FOR A PARTICULAR PURPOSE, OR THAT THE ROBOT WILL NECESSARILY
CONFORM TO THE ILLUSTRATIONS OR DESCRIPTIONS PROVIDED." (Contract, p. 8.)
The Contract reiterates, "EXCEPT AS PROVIDED ABOVE, NO WARRANTY OR
AFFIRMATION OF FACT, EXPRESSED OR IMPLIED, OTHER THAN THAT STATED
SPECIFICALLY HEREIN, IS MADE OR AUTHORIZED BY ISLAND ROBOTS OF
FLORIDA." (*Id.*) These exclusions are adequately conspicuous because they use all capital letters.
They also use the term "merchantable" as required by U.C.C. Section 2-316(2). Thus, Plaintiff could
not have reasonably relied on the implied warranties, and the undersigned respectfully recommends
that its claim for violations of the Uniform Commercial Code be dismissed.

### E. Violation of General Business Law Section 350

Count Nine of the SAC alleges a violation of New York's False Advertising Law, General
Business Law § 350 ("G.B.L. § 350"). (SAC., ¶¶ 115-121.) G.B.L. § 350 states that "[f]alse
advertising in the conduct of any business, trade or commerce or in the furnishing of any service in
this state is hereby declared unlawful." N.Y. Gen. Bus. Law § 350 (McKinney, 2019). To state a
claim under G.B.L. § 350, Plaintiff must allege that Defendants "engaged in (1) consumer-oriented
conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the
allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015);
*Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 222 (E.D.N.Y. 2018); *see Koch v. Acker, Merrall & Condit
Co.*, 967 N.E.2d 675, 675 (2012). Conduct is "consumer-oriented" if it "has a broader impact on
consumers at large," rather than just on Plaintiff. *Donnenfeld*, 333 F. Supp. 3d at 222. This element is
met if Defendants' conduct could "potentially affect similarly situated consumers." *Id.* at 222-223.
Conduct is "materially misleading" if it would be "likely to mislead a reasonable consumer acting

reasonably under the circumstances." *Orlander*, 802 F.3d at 300. To demonstrate injury, Plaintiff

must allege that it did not receive the full value of its purchase, on account of the misleading

conduct. *Donnenfeld*, 333 F. Supp. 3d at 223-224. Claims under G.B.L. § 350 are not subject to Rule

9(b)'s pleading-with-particularity requirements, *Daniel v. Mondelez Int'l*, Inc., 287 F. Supp. 3d 177, 186

(E.D.N.Y. 2018), and may also exist alongside claims for breach of contract. *Donnenfeld*, 333 F.

Supp. 3d at 224.

Plaintiff's allegations sufficiently establish Defendants' liability for violation of G.B.L. § 350.

According to the SAC, Plaintiff became aware of Defendants' products through Defendants'

advertisements on the internet, including their website. (SAC., ¶¶ 21, 58, 118.) Defendants also

market their products on social media sites, such as Facebook and LinkedIn. (Pl. Supp. Mem. at 21.)

*See Donnenfeld*, 333 F. Supp. 3d at 222-223 (information contained on websites and available through

the internet is considered consumer-oriented). Defendants' conduct is, therefore, consumer-

oriented.

Plaintiff established that Defendants' conduct was materially misleading because the robots

advertised on Defendants' website misrepresented the "use and functionality" of the Robot Plaintiff

actually received, which was entirely non-functional. (SAC, ¶¶ 118.) Defendants' advertisement

promises a wide array of functionality for the FoneBot, including that it is a "walking talking" smart

phone that is "fully mobile, interactive."[4] (Dkt. 65-4.) Defendants' advertising includes

representations about their skill and expertise, including Martin's "30 years experience in robotics,

animatronics and automation." (*Id.*) The undersigned finds that a reasonable consumer would be

misled by Defendants' representations, in that he or she would believe, as Plaintiff did, that the

---

[4] Defendants are still advertising the FoneBot on their website. *See*
https://www.islandrobotsofflorida.com/ (last visited Sept. 14, 2019) (Pl. Supp. Mem., pp. 20-21.)

Robot purchased would be a "walking talking" smart phone that was "fully mobile, interactive." (Dkt. 65-4.)

Plaintiff also suffered injury by paying $8,500 for a defective product, which it would not have done but for Defendants' deceptive practice.  (SAC, ¶¶ 119, 121; Contract, p. 2.)  *See Donnenfeld*, 333 F. Supp. 3d at 223-224.

Accepting the facts in Plaintiff's allegations as true, as required in a motion for default judgment, the undersigned finds that Plaintiff has adequately established Defendants' liability for false advertising pursuant to G.B.L. § 350.

## V.    Damages

Even though "a party's default is deemed to constitute a concession of all well-pleaded allegations of liability, it is not considered an admission of damages."  *Greyhound Exhibitgroup*, 973 F.2d at 158.  On a motion for default judgment, the plaintiff bears the burden of presenting proof of damages, which may take the form of documentary evidence, detailed affidavits, or testimony at an inquest.  *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 508 (2d Cir. 1991); *Liberty Mut. Ins. Co. v. Fast Lane Car Serv., Inc.*, 681 F. Supp. 2d 340, 346 (E.D.N.Y. 2010).  The amount of damages awarded, if any, must be ascertained "with reasonable certainty."  *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999); *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83-84 (E.D.N.Y. 2012).  "When a plaintiff seeks compensation for the same damages under different legal theories for wrongdoing, the plaintiff should receive compensation for an item of damages only once."  *Pierre v. Planet Auto., Inc.*, No. 13-CV-0675 (MKB) (JO), 2018 WL 1385906, at *2 (E.D.N.Y. Feb. 21, 2018), *R&R adopted*, 2018 WL 1385882 (E.D.N.Y. Mar. 19, 2018) (internal quotations and citations omitted).

### A. Contract Damages

A plaintiff seeking contract damages may seek two categories of damages – general (*i.e.*, market) damages, or special (*i.e.*, consequential) damages. *Varian*, 340 F. App'x at 750 (quoting *Schonfeld v. Hilliard*, 218 F. 3d 164, 175 (2d Cir. 2000)). General damages "recover the value of the very performance promised." *Id.* Special damages seek to compensate for losses in addition to the contract price that are incurred as a result of the defendant's breach. *Id.* Consequential damages are generally recoverable only where the defendant was on notice of these damages at the time of contracting. *Id.* Consequential damages may be excluded by the terms of the contract. *Id.*

Here, Plaintiff may recover the value of the Contract, which is $8,500. It is barred from seeking special or consequential damages by the exclusion contained in the Limited One-Year Warranty provision of the Contract. Accordingly, the undersigned respectfully recommends that Plaintiff be awarded **$8,500 for Defendants' breach of the Contract**.

### B. Fraud Damages

"The measure of damages recoverable for being fraudulently induced to enter into a contract which otherwise would not have been made is indemnity for the loss suffered through that inducement." *Deerfield Comm'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (1986) (internal quotations omitted). New York employs the "out-of-pocket" rule when measuring damages incurred as a result of fraud, *i.e.*, the costs expended in "preparation or in performance," which can include consequential damages proximately caused by Plaintiff's reliance on the misrepresentation that would not otherwise have been incurred. *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 793 n.6 (2d Cir. 1986); *Barrie House Coffee Co.*, 2016 WL 3645199, at *11.

Here, Plaintiff is entitled to reasonable shipping costs incurred as a result of Defendants' fraudulent inducement of the Contract, because such costs would not otherwise have been incurred but for Defendants' fraud. Shipping costs are foreseeable damages here, because the cost of

shipping was specifically excluded from the price of the Robot, and the Robot clearly needed to be shipped from Florida to New York, using a special crate. (Contract, p. 2.) Plaintiff submitted proof of payment in the form of a copy of a check for $1,750 to Circle Logistics, Inc. for the cost of shipping the Robot to New York. (Dkt. 64-2.) The undersigned finds that this is an appropriate amount and recommends that Plaintiff be awarded this cost.

Plaintiff also submitted evidence that it is incurring a cost of $100 per month to store the Robot at its facility on behalf of WOC. (Inquest, Ex. 5; Finkelman Aff., ¶ 18.) As of July 1, 2019, the total amount WOC apparently owes to Plaintiff is $3,600. (*Id.*) The invoice for storage was generated by Plaintiff and billed to its affiliate WOC, which is in effect the same entity as Plaintiff. (Inquest, Ex. 5; Finkelman Aff., ¶¶ 4-7, 18.) The Court finds that Plaintiff has not sufficiently supported its damages claim for the cost of storing the Robot. By basically invoicing itself, Plaintiff has not incurred any out-of-pocket expense as a result of storing the Robot. (Inquest, Ex. 5.)

The undersigned likewise rejects Plaintiff's claim for storage costs of $550 for one month at the Garage, where the Robot was apparently stored in a parking space, reflecting the lost income that the Garage could not realize by renting the space. (Pl. Supp. Mem. at 33.) There is no basis for awarding these damages. Accordingly, the undersigned respectfully recommends that **$1,750, the cost of shipping, is the measure of fraud damages to which Plaintiff is entitled**.

### C. General Business Law Section 350

Plaintiff seeks statutory damages and attorneys' fees pursuant to G.B.L. § 350. (SAC, ¶ 120.) Under G.B.L. § 350-e, the Court may award a prevailing Plaintiff the greater of its actual damages or $500, as well as reasonable attorneys' fees. *See* N.Y. Gen. Bus. Law § 350-e(3); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 280 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). "Actual damages" includes the purchase price of the contract. *See Orlander*, 802 F.3d at 301-02. The Court has

23

discretion to treble the actual damages amount, up to $10,000, if the Court determines that Defendants willfully or knowingly violated the statute. N.Y. Gen. Bus. Law § 350-e(3).

Because the undersigned finds that Defendant is liable for a violation of G.B.L. § 350, Plaintiff is a prevailing party and is entitled to an award of attorneys' fees. In determining an award for attorneys' fees, the Court should employ the test ordinarily used by New York courts, which considers "the time and skill required in litigating the case, the complexity of issues, the customary fee for the work, and the results achieved." *Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 25 F. Supp. 2d 127, 132 (E.D.N.Y. 1998) (citing *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir.1992)). Plaintiff must submit contemporaneous time records in support of a fee application, including the "date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

Here, Plaintiff seeks the maximum statutory damages, or $10,000. Statutory damages equal the purchase price of the Robot, or $8,500. When trebled, this amount exceeds $10,000, leading Plaintiff to request $10,000. (Pl. Supp. Mem. at 29-30.) Plaintiff fails to cite any authority to support its claim for statutory damages pursuant to G.B.L. § 350, instead citing cases brought pursuant to the Cable Act and the Copyright Act. (Pl. Supp. Mem., at p. 29.) Accordingly, the undersigned declines to recommend that Plaintiff be awarded actual or statutory damages.

Plaintiff also seeks $53,730.50 in attorneys' fees and provided contemporaneous time records, which include narrative descriptions, attorney rates, and the time spent per task. [5] (Pl. Supp. Mem. at 29-30; Dkts. 64-4; 65-6.) However, the fees requested are plainly excessive, given that the value of the Robot and the cost of shipping equal less than $15,000. *Greenberg*, 14 F. Supp. 3d at 280 ("[T]he attorney's fees incurred in this case . . .bore no relationship to the amount of actual damages

---

[5] Although the checks to Plaintiff's attorneys are from WOC, rather than Plaintiff, Plaintiff presented evidence that it is the entity that incurred those fees. (Finkelman Aff., ¶¶ 17, 18.)

24

at issue.")  Where, as here, Plaintiff achieved only partial success on its claims, the Court may reduce the award to account for the limited success.  *See Indep. Living Aids, Inc.*, 25 F. Supp. 2d at 133-134. After reviewing the bills and time records submitted during the Hearing and Inquest, the undersigned is unable to determine, beyond a handful of time entries, how much time was spent specifically on Plaintiff's G.B.L. § 350 claim.  Plaintiff is not entitled to attorneys' fees under the contract or fraud claims, only for false advertising.  *See, e.g., Barrie House Coffee Co.*, 2016 WL 3645199, at *11-12.  Accordingly, the undersigned recommends that the total attorneys' fees be divided by four, which reflects the single count of the four total claims, for which attorneys' fees are recoverable.  *See, e.g., Indep. Living Aids, Inc.*, 25 F. Supp. 2d at 133-134.  Accordingly, the undersigned respectfully recommends that **Plaintiff be awarded $13,433 in attorneys' fees for its General Business Law Section 350 claim**.

### D.  Punitive Damages

Plaintiff seeks punitive damages.  (SAC, "Prayer for Relief"; Pl. Supp. Mem. at p. 29.)  In order to state a claim for punitive damages in New York when a claim arises from a contract, Defendants' conduct must be actionable as an independent tort, the tortious conduct must be of an "egregious nature," which is directed at Plaintiff, and must also be part of a pattern directed at the public generally.  *New York Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (1995).  "[I]t is necessary to allege fraud that is founded upon such moral indifference as to be aggravated by evil or to be demonstrative of a criminal indifference to civil obligations."  *Greenberg*, 14 F. Supp. 3d at 273 (internal citations and quotations omitted).  Conduct that warrants awarding punitive damages has been described as "close to criminality," "utter recklessness," "reckless and of a criminal nature," "wanton and malicious," and "gross and outrageous."  *Id.*  The purpose of punitive damages is to "vindicate public rights," rather than "remedy private wrongs."  *Kruglov v. Copart of Connecticut, Inc.*, 771 F. App'x 117, 120 (2d Cir. 2019).  Punitive damages must be proven by clear and convincing

evidence. *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 526 (S.D.N.Y. 2011).

Here, Plaintiff has not alleged specific facts that Defendants' conduct rises to the level of near criminality, wantonness, or utter recklessness. Plaintiff also does not demonstrate that Defendants' conduct was part of a larger pattern of fraud, or allege that other members of the public were subjected to the same conduct. Plaintiff adequately alleged that Defendants engaged in fraudulent behavior, but Plaintiff has not demonstrated through clear and convincing evidence that public rights must be vindicated, such that the Court should impose punitive damages. Accordingly, the undersigned respectfully recommends that Plaintiff's request for punitive damages be denied.

### E.  Costs

Plaintiff seeks costs it incurred in the litigation, totaling $6,367.61. (Pl. Supp. Mem. at p. 33.) Pursuant to Federal Rule of Civil Procedure 54(d), Plaintiff is entitled to recover the costs in litigating this action. Fed. R. Civ. P. 54; *see also Arch Specialty Ins. Co. v. Kajavi Corp.*, No. 18-CV-4043 (NGG) (SMG), 2019 WL 3719461, at *3 (E.D.N.Y. July 11, 2019), *R&R adopted*, 2019 WL 3717441 (E.D.N.Y. Aug. 7, 2019). Appropriate costs include process service fees, postage, and legal research database fees. *See, e.g., Pierre*, 2018 WL 1385906, at *6.

The undersigned has reviewed the invoices provided by Plaintiff, consisting of process server-related fees of $3,110.90, and postage, copying, and legal research fees of $3,256.71, and finds that the costs incurred for process server fees are reasonable, considering the documented difficulties that Plaintiff had in serving Defendants. (*See, e.g.*, Dkt. 57-13.) However, the costs incurred for postage, copying, and legal research fees are excessive, and the undersigned recommends that Plaintiff recover a quarter of these costs, or $815. Accordingly, the undersigned respectfully recommends that **Plaintiff be awarded costs totaling $3,925.90**.

### F. Pre-Judgment Interest

Under New York law, pre-judgment interest is available in actions for breach of contract and fraud. *See, e.g., Graham v. James*, 144 F.3d 229, 239 (2d Cir. 1998); *Gov't Employees Ins. Co. v. Badia*, No. 13-CV-1720 (CBA) (VMS), 2015 WL 1258218, at *24 (E.D.N.Y. Mar. 18, 2015); N.Y. C.P.L.R. § 5001(a) (McKinney, 2019). "Interest shall be computed from the earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). Contract claims accrue at the time of the breach. *Cont'l Cas. Co. v. Contest Promotions NY, LLC*, No. 15-CV-501 (MKB), 2016 WL 1255726, at *7 (E.D.N.Y. Mar. 28, 2016). The statutory interest rate for pre-judgment interest in New York is nine percent per annum. N.Y. C.P.L.R. § 5004.

Plaintiff is entitled to pre-judgment interest on its contract and fraud claims. The earliest ascertainable date that the cause of action existed is July 31, 2016, when Plaintiff received the defective Robot. (SAC, ¶ 34; Inquest, Ex. 3, Dkt. 64-2.) Pre-judgment interest on the value of the contract, $8,500, plus the cost of shipping, $1,750, at a rate of nine percent per annum, for the 295 days between July 31, 2016, when the Robot arrived, until May 22, 2017, when Plaintiff filed the action, is $2.53 per day.

Accordingly, the undersigned respectfully recommends that Plaintiff be awarded pre-judgment interest of **$746.35, plus $2.53 per day, from May 22, 2017 to the date of judgment**.

### G. Post-Judgment Interest

Plaintiff is also entitled to post-judgment interest pursuant to the rate set forth in 28 U.S.C. § 1961(a). In federal diversity actions, federal courts must apply the federal rate. *See Arch Specialty Ins. Co.*, 2019 WL 3719461, at *4 (quoting *Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112-113 (2d Cir. 2013)). Accordingly, the undersigned respectfully recommends that Plaintiff be awarded **post-judgment interest, to be calculated from the date the Clerk of Court enters judgment in this action until after the date of payment, at the rate set forth in 28 U.S.C. § 1961**.

## CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that default judgment be entered against Defendants, finding them liable for Count Three (Fraud), Count Four (Breach of Contract), and Count Nine (False Advertising under G.B.L. § 350), but not liable on Count Eight (Violations of the Uniform Commercial Code), and that Plaintiff be awarded damages in the total sum of **$27,608.90**, plus pre- and post-judgment interest, comprised of:

(i)  **$1,750** in compensatory damages for Plaintiff's fraud claim;

(ii)  **$8,500** in general damages for Plaintiff's contract claim;

(iii)  **$13,433** in attorneys' fees pursuant to Plaintiff's General Business Law Section 350 claim;

(iv)  **$3,925.90** in litigation costs;

(v)  **$746.35** in pre-judgment damages, plus **$2.53** per day from May 22, 2017 to the date of judgment; and

(vi)  Post-judgment interest as provided in 28 U.S.C. § 1961, to run from the date of judgment until judgment is satisfied.

Plaintiff is directed to serve this Report and Recommendation on Defendants forthwith and file proof of service on the docket by October 7, 2019.

Any objection to this Report must be filed in writing with the Clerk of Court within fourteen (14) days of service.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to timely file any just objection waives the right to further judicial review of this Report and Recommendation.  *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
         October 4, 2019